MEMORANDUM OF DECISION
This case presents a coterminous petition for the termination of the parental rights of Luis O., who is the biological father of Luis, and Yamil P., who is the putative father of Nazmi. The mother of these children, Elizabeth O., died after the neglect petitions were filed but before the termination petitions were brought by DCF. CT Page 2279
Procedural Background
On August 21, 1998. the Department of Children and Families (DCF), filed neglect petitions regarding Nazmi and Louis alleging that the children were being denied proper care and attention physically, educationally, emotionally or morally and that the children were being permitted to live under conditions, circumstances or associations injurious to the children's well-being. On the same date an order of temporary custody was entered by the court. (Ward, J.)
On August 27, 1998, Elizabeth O. died of a brain aneurysm. On September 29, 1998, DCF filed petitions for termination of parental rights with regard to both children. On June 11, 1999, the pending neglect and termination petitions were consolidated and given coterminous status.
With regard to Luis O., DCF alleged that Luis has been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for his physical, educational, or emotional well-being. Conn. Gen. Stat. § 17a-112 (c)(3)(C). With regard to Yamil P., DCF alleged that Nazmi has been abandoned by her father. Conn. Gen. Stat. § 117a-112 (c)(3)(A).
On September 27, 1999, the court granted the paternal grandmother, Nidia A's, motion to intervene for dispositional purposes only. The court was asked by counsel for Nidia to also address her motion to transfer guardianship after hearing all of the evidence in the termination proceedings.
The court heard testimony on October 12, October 13, October 21, November 24, 1999 and February 4, 2000. For the reasons stated below, the court grants the neglect petitions regarding Nazmi and Luis. The court also grants the termination petition with regard to Yamil P., father of Nazmi. The court dismisses the termination petition regarding Luis.
FACTS
The court finds the following facts by clear and convincing evidence.
On August 13, 1998, Elizabeth O. was severely beaten by her husband, Luis. Elizabeth stated to DCF that Luis had repeatedly punched her in the back of the head "as if she were a man." Her CT Page 2280 face was swollen and she had scratch marks on her face and arms. She also complained of a headache.
As of August 13, 1998, the family had become homeless because they had been thrown out of the paternal grandmother's home. Elizabeth and the children had been living in a hallway in an apartment building for at least a day and Elizabeth had no safety plan. Elizabeth confirmed that the children had been present when she was beaten by Luis and had been present in the past when there had been domestic violence incidents.
DCF subsequently placed Elizabeth and the children in a battered womens' shelter. Several days after being placed in the shelter, the shelter informed DCF that Elizabeth and her children were going to be removed because mother had broken various rules. Specifically, Elizabeth was not attending group sessions and had gone to see Luis with the children on several occasions. Additionally, she had not bathed the children all weekend and was not feeding them properly. DCF invoked a 96-hour hold and filed a motion seeking temporary custody of the children because Elizabeth had no safety plan for herself and the children. Approximately one week later Elizabeth died of a brain aneurysm.
Luis has an extensive criminal history which includes two convictions for Assault 3, and convictions for Threatening, Sale of Hallucinogens/Narcotics, and Sale of Illegal Drugs. After the children were taken into custody by DCF, Luis was arrested on August 31, 1998, in part on an outstanding arrest warrant for assaulting his mother. After making bail, Luis visited with the children three times in September but then did not make himself available to the children or the Department in October 1998. He was incarcerated again in November and has remained in prison since that date. He had at least one initial conversation with DCF about the type of services he would need in order to regain custody of the children but no services were put into place prior to his incarceration in November. He is currently incarcerated and eligible for parole January of 2001. While he was incarcerated, Luis was placed in a program for gang members based on his known affiliation with the Latin Kings. He finished this program successfully by complying with all the rules and regulations of the program.
When a DCF worker initially asked the paternal grandmother whether her son had physically abused her, she denied that Luis had assaulted her. When confronted with the arrest record, she CT Page 2281 minimized the incident and said that her daughter-in-law had provoked the domestic violence. Despite admitting that her son had choked her, she indicated that she did not believe that this was a serious situation.
YAMIL P.
During trial Luis O. tried to establish that he was the father of Nazmi. Two paternity tests were entered into evidence that conclusively establish that Luis O. is not the father of Nazmi. Because the tests reveal that there is a 0.00 percent probability that Luis O. is the father of Nazmi, the court makes a finding that he is not her father.
Yamil P. is the putative father of Nazmi. This father received proper notice of the termination of parental rights proceedings through publication but has never appeared in these proceedings. There is no indication that Yamil has ever met with Nazmi.
NEGLECT ADJUDICATION
In hearing coterminous petitions for neglect and termination, the court first adjudicates whether there is neglect. Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. The standard of proof in a neglect phase is by a fair preponderance of the evidence and in the termination phase, if reached, by clear and convincing evidence. Practice Book Section 33.12; Conn. Gen.Stat. § 17a-112 (b).
In accordance with the statutory requirements and the relevant case law, the court finds by a preponderance of the evidence that Luis was neglected within the meaning of the statute. This child was denied proper care and attention physically, educationally, emotionally or morally and the child was being permitted to live under conditions, circumstances or associations injurious to the child's well-being. Specifically, the child witnessed domestic violence between his mother and father and neither parent was willing or able to provide a safe environment for the child after the parents were thrown out of the grandmother's home.
The court also finds by a preponderance of the evidence that Nazmi was denied proper care and attention physically, educationally, emotionally or morally and was being permitted to live under conditions, circumstances or associations injurious to CT Page 2282 the child's well-being. The putative father, Yamil P., failed to protect the child from witnessing repeated domestic violence and failed to provide the child a home when the mother became homeless.
NEGLECT DISPOSITION
The court finds that it is in the best interest of Luis and Nazmi to commit them to the custody of the Department of Children and Families for a period not to exceed twelve months. Mother is deceased and father is currently incarcerated. For reasons that will be discussed more fully below, the court does not feel that it is in the best interest of the children at this time to transfer guardianship to Nidia A.
REASONABLE EFFORTS
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in the proceeding, a parent is unable or unwilling to benefit from reunification efforts." Conn.Gen. Stat. § 17a-112 (c)(1).
Prior to filing the termination petition, DCF did offer Luis visitation and he visited the children three times in September. While services were apparently discussed, none had actually been put into place as of September 29, 1998, the date the termination petition was filed. Jean Augeri, the DCF supervisor assigned to this case, testified that the reasons for filing the termination petition so soon after filing the neglect petition were that father was a suspect in mother's death, father was whereabouts unknown after the OTC was granted and father faced the prospect of a long incarceration. When confronted with her own records, Ms. Augeri conceded that Luis was not whereabouts unknown prior to DCF filing the termination petition and that DCF should have known that he was no longer a suspect in mother's death. That father possibly faced a long prison sentence, that had not yet even been determined by a court, was clearly not a legitimate basis for filing the termination "petition. Therefore, because DCF made no effort to work with this father prior to filing the termination petition, petitioner has not established by clear and convincing evidence that DCF made reasonable efforts to reunify this family. CT Page 2283
With regard to Yamil P., the court makes a finding by clear and convincing evidence that he is unwilling to benefit from reunification efforts because he has totally abandoned Nazmi and has never come forward to the Department.
TERMINATION ADJUDICATION
A termination petition which can result in severing family ties implicates serious constitutional concerns. The United States Supreme Court held in Santosky vs. Kramer, 455 U.S. 745, 753 (1982) that: "the fundamental liberty interests of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents where they have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."
However, parents' constitutional rights do not exist in a vacuum without reference to the rights of others in the family. In particular, they do not override a child's right to be safe and to grow and to be nurtured in a supportive environment. As set forth in Conn. Gen. Stat. § 17a-101 (a): "the public policy of this state is: to protect children whose health and welfare may be adversely effected through injury and neglect."
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is September 29, 1998.
The petitioner has not demonstrated by clear and convincing evidence that Luis has been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for his physical, educational or emotional well-being. "This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In reKelly S., 29 Conn. App. 600, 614 (1992). Thus, termination of parental rights under this ground requires clear and convincing evidence of specific conduct that has caused serious injury to CT Page 2284 the child.
No factual or expert testimony was presented regarding whether the domestic violence perpetrated against this child's mother caused serious emotional injury to this child. While the court is aware that domestic violence can have a serious detrimental effect on children, and can infer that in this case it caused some injury to the child, the petitioner has not sustained its burden of proof by clear and convincing evidence that the violence caused serious emotional or physical injury to Luis.
Furthermore, when Ms. Augeri was asked why the petition was filed if father was not whereabouts unknown and was no longer a suspect in his wife's death, the only reason offered was "I'm assuming probably at the time we had already started to file the TPR. It does not take us just a couple of days to file a TPR." This statement and the decision of DCF to go forward with this petition on the grounds of acts of ommission/commission demonstrates an absolute lack of respect for the rights of this parent and a fundamental misunderstanding of these statutory grounds. The record does not support this ground and the petition must be dismissed.
ABANDONMENT
The petition alleges that Nazmi has been abandoned by her father "in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(A). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia, 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 309 (1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The court finds by clear and convincing evidence that Yamil P. has never been involved in Nazmi's life and therefore this child has been abandoned by her father.
MANDATORY FINDINGS
Because the court has found that petitioner has failed to prove its case at the adjudicatory stage against Luis O., it is not CT Page 2285 necessary to make the mandatory factual findings with regard to him. With respect to the father of Nazmi, as required by Conn.Gen. Stat. § 17a-112 (d), the court makes the following findings:
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Despite having received notice by publication, Yamil P. has never made his whereabouts known and therefore DCF has been unable to provide him with any services to facilitate the reunion of this child with his parent.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance Child Welfare Act of 1980.
Because this father has not made his whereabouts known to DCF, DCF has not been able to provide assistance in reuniting the family.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Because this father has not made his whereabouts known and has never appeared in this case, no court orders have been entered against this individual.
4. The feelings and emotional ties of the children with respect to their parents, any guardian and any person who has exercised physical care, custody or control of the children for at least one year and with whom the children have developed significant emotional ties.
Nazmi is bonded with her foster parents. She has no emotional ties with her biological father.
5. The age of the child.
Nazmi is four years old.
6. The efforts the parent has made to adjust his circumstances CT Page 2286 or conditions to make it in the best interest of the child to return her to her home in the foreseeable future, including, and not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided the court may give weight to incidental visitations, communications or contributions and, (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
This father has never spent any time with Nazmi.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person, or by economic circumstances of the parent.
No unreasonable acts prevented this father from having contact with his child.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child."Conn Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring the close of the dispositional hearing. Connecticut Practice Book § 33-5. Because Nazmi has had no contact or relationship with her biological father and is in need of permanency, the court determines that it is in Nazmi's best interest for a termination of parental rights to enter with respect to Yamil P. Accordingly, a termination of Yamil P.'s parental rights is ordered. It is further ordered that the Commissioner of DCF be appointed statutory parent for Nazmi for the purpose of securing an adoptive home. The Commissioner shall file with this court, no later than 60 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Supplemental Orders
The earliest that Luis is scheduled to be released from prison is January, 2001. This means that Luis will not physically be available to care for his son for another year. Additionally, Dr. CT Page 2287 Mantell testified that Luis would have to be released from prison without relapsing or violating the law for at least one additional year, or a total of two years, before he should be considered as a viable parent. Given father's long history of drug abuse, assaultive behavior and criminal record, the court is skeptical as whether he will be successful. The court also notes that steps were entered for Luis on August 21, 1998, and that he has not complied with them in that he admitted using drugs after this date and he has had further involvement with the criminal justice system.
The court has serious concerns regarding Luis' need for permanency. Further, the court is well aware that its decision today regarding Luis may also impact permanent placement of Nazmi. To ensure that this case does not languish it is further ordered that a Court Service Officer schedule a case status conference by March 15, 2000, to allow the parties to address whether further reunification efforts are appropriate or whether a new termination of parental rights petition should be filed by DCF. It is further ordered that the following specific steps enter regarding Luis O. as part of the neglect disposition.
SPECIFIC STEPS
 1. Keep all appointments set by DCF. Cooperate with DCF home visits, announced or unannounced.
2. Keep whereabouts known to DCF and your attorney.
3. Visit the child as often as DCF permits.
 4. Participate in counseling: parenting and individual, and anger management.
 5. Submit to substance abuse assessment and follow recommendations regarding treatment. Successfully complete substance abuse treatment and follow recommendations regarding after care treatment including relapse prevention.
 6. Submit to weekly drug testing regardless of the outcome of any substance abuse assessment.
7. Accept and cooperate with in Home Support Services referred by DCF.
 8. Sign releases authorizing DCF to communicate with service providers CT Page 2288 to monitor attendance, cooperation and progress.
 9 Secure and maintain adequate housing and legal income. Provide verification of legal employment.
10. No substance abuse.
 11. No further involvement with the criminal justice system. Cooperate with the office of Adult Probation or Parole.
12. Do not engage in any domestic violence or assaultive behavior.
MOTION TO TRANSFER GUARDIANSHIP
Nidia A., the paternal grandmother of Luis, has filed motions to transfer guardianship of Luis and Nazmi to her.
Because she has filed the motion, she bears the burden of proof in establishing by a preponderance of the evidence that it is in the best interest of Luis and Nazmi to grant the motion.
This grandmother unquestionably loves Luis. Even though it has been established that she is not the biological grandmother of Nazmi, she is clearly bonded with this child as well. She has remained consistent in her visitation and clearly wants to be with the children.
The court, however, shares the same concerns voiced by DCF about the grandmother's ability to protect these children from her son. Her denial of and minimization of the serious assaults by her son directed at women further fuels this concern. Additionally, Dr. Mantell testified at trial that the strong interdependency with her son makes her reluctant to do anything to jeopardize that relationship. Dr. Mantell has strong concerns about her ability to protect these children and is concerned that she would give in to Luis' demands and might not protect the children from his excessive behaviors. It was also apparent when she testified that she would be extremely reluctant to not have her son living with her when he is released from prison. Finally, Nidia continues to blame her son's violence toward women on the conduct of Elizabeth. She simply does not understand that domestic violence is never acceptable regardless of a spouse's conduct.
Based on all the evidence presented, this court cannot find CT Page 2289 that this grandmother would be capable of protecting the children if Luis reverts to his abusive behavior upon his release from incarceration. For all these reasons, the court finds that the grandmother has not carried her burden in establishing that the best interest of the children warrants transfer of guardianship to her. The motion to transfer guardianship is therefore denied. However, given that the children are not going to be adopted by their current foster parents and the children are still not placed together despite their close bond, the court strongly recommends that DCF immediately reconsider its decision not to use the paternal grandmother as a placement resource while the children are committed to the department.
CHASE T. ROGERS JUDGE OF THE SUPERIOR COURT